Evan Lee HOIT and Evelyn Jeanne Hoit, Respondents,

v.

Brent Warren RANKIN and Kimberly Webb, Appellants.

No. WD 71159.

Missouri Court of Appeals, Western District.

Sept. 28, 2010.

C. Carl Kimbrell, N. Kansas City, MO, for appellants.

Louis Angles, Excelsior Springs, MO, for respondents.

Before Division One: JAMES M. SMART, JR., Presiding Judge, MARK PFEIFFER, Judge, CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

This is an appeal from a judgment entered in a partition action. Brent Warren Rankin ("Rankin") and his wife, Kimberly Webb ("Webb"), (collectively referred to as the "Rankins")[1] contend that the trial

---

1. We will refer to Rankin and Webb collectively as the "Rankins" for simplicity, intending no disrespect to Ms. Webb.

court erred when it found that the respective interests owned by the Rankins and Evan Lee Hoit and Evelyn Jeanne Hoit (the "Hoits") in a residence at 1713 Jordan Street, Kearney, Missouri (the "House") were unequal. The Rankins also contend that the trial court erred in awarding the House to the Hoits outright, while awarding the Rankins a judgment against the Hoits and a lien against the House for the value of monetary contributions they made to pay taxes and insurance. The Rankins claim this option was not available to the trial court under the partition statute, Section 528.030.[2] We affirm the trial court's judgment as herein modified.

## Factual and Procedural Background

The Hoits, husband and wife, lived on a farm in McClouth, Kansas, for nearly forty years.[3] In the summer of 2007, the Hoits decided to move to Kearney, Missouri, to be closer to their two adult daughters. At the time, Rankin was living in Houston, Texas, with his wife, Webb. Rankin is Mrs. Hoit's son and Mr. Hoit's step-son. Webb is Rankin's seventh wife and was not well known to the Hoits. Rankin simultaneously expressed an interest in moving to Kearney, Missouri, to be closer to his adult son and grandson.

The Rankins were pre-qualified for a loan and began looking for homes in Kearney. Although the Rankins were using a realtor to assist with their search, Rankin asked the Hoits to look at several of the homes that were of interest to them given the Hoits' closer proximity to the area. The Hoits decided to look for a suitable home for themselves at the same time.

In late June, 2007, the Hoits viewed the House. The House was not on the list of homes that were of interest to the Rankins. The Hoits liked the House and told the Rankins. On July 2, 2007, Rankin traveled to Kearney to look at the House. Following this visit, the Hoits and the Rankins began discussing the possibility of living in the House together.[4] The Hoits made it clear they wanted the House either way but offered the Rankins the opportunity to live in the lower level of the House.

The Hoits and the Rankins decided that the Hoits would purchase the House and that the Rankins would live on the lower level of the House, with both families sharing the kitchen. Though "ownership" of the House at the time of purchase was never discussed, Mrs. Hoit did testify that she and Mr. Hoit intended that, upon their deaths, the House would pass to her son, Rankin, and that their money would go to the Hoits' two daughters. Mrs. Hoit testified that she and Mr. Hoit hoped that Rankin would take care of them, should they require assistance, until they died, though no such assistance was required during the short time the Hoits and the Rankins lived together. The Hoits both testified that it was never their intention to give the Rankins the House at the time of purchase or at any time during their lifetimes.

Because the Rankins were already pre-qualified for a loan, the Rankins secured the mortgage for the House to facilitate a speedier closing, instead of waiting for the Hoits to sell their farm. The purchase

2. All statutory references are to RSMO 2000 as supplemented unless otherwise indicated.

3. We view the evidence and all reasonable inferences from the evidence in the light most favorable to the judgment. *Alongi v. Alongi,* 72 S.W.3d 592, 594 (Mo.App. W.D.2002).

4. The Hoits had originally planned to move in with their eldest daughter. However, they determined that renovations necessary to their daughter's home were cost prohibitive. They thus decided to look for a home of their own.

price for the House was $188,500. At the closing on August 14, 2007, the Hoits paid $47,348.03 in cash toward the purchase price, closing costs and other assessed fees. The Rankins secured a $142,500 loan, the proceeds of which were applied to the purchase price. The Hoits signed the necessary closing paperwork in Missouri, and the Rankins signed the necessary paperwork in Texas. It was not until closing that the Hoits realized the Rankins' names appeared on the paperwork as "co-owners" of the House. The Warranty Deed to be delivered at closing identified the owners as "Evan Hoit and Evelyn J. Hoit, Husband and Wife and Brent Rankin and Kimberly Rankin, Husband and Wife as joint tenants with right of survivorship."[5] Mr. Hoit testified that although he saw the Rankins' names on the deed, he "didn't understand it. I didn't know why they was there, but things was such a hassle at the time that I probably did sign it [referring to the deed]."[6]

After the closing, the Rankins sold their Texas home. They moved into the House in September 2007. The Hoits sold their farm in November and moved into the House at that time. The Hoits used the proceeds from the sale of the farm to pay off the mortgage on the House. The Rankins do not dispute that, as a result, the entire purchase price for the House was paid by the Hoits.

When the Hoits moved into the House, they learned that the Rankins had taken over an upstairs room that Mrs. Hoit had expressly indicated would be used for her piano. The Rankins had also placed belongings all over the upstairs portion of the House, such that there was virtually no room for any of the Hoits' furniture and personal belongings, necessitating their sale.

Over the next several months, the joint living arrangements between the parties deteriorated. In late July, 2008, Mrs. Hoit demanded that the Rankins move out of the House. The Rankins refused to do so. The Rankins claimed the House belonged to them. The situation became so unbearable that the Hoits purchased a second home in the Kearney, Missouri, area in September 2008 and moved out of the House.

On September 18, 2008, the Hoits filed a petition seeking partition of the House. The Rankins filed a counterclaim, which failed to specify a theory of recovery, but which sought damages for their detrimental reliance on the Hoits' "promise" to gift them the House on their deaths.

On May 18, 2009, following a trial to the court, the trial court entered its judgment ("Judgment"). The trial court found in favor of the Hoits on the Rankins' counterclaim. On the partition claim, the trial court found that the Hoits paid $192,-

---

**5.** The Rankins acknowledged during oral argument that it is likely that the Rankins were named as co-owners on the deed as a requirement of the Rankins' mortgage lender, as the lender would have been unwilling, based on common practice, to extend a mortgage to the Rankins secured by real estate in which the Rankins did not hold title. Moreover, though the mortgage was secured based on the Rankins' preapproval, it appears from recitals in a deed of release recorded after the Hoits later paid off the mortgage, that the lender required the Hoits to sign the deed of trust, and perhaps even the promissory note. The lender would likely have been unwilling, based on common practice, to accept a deed of trust as collateral security that had not been executed by all title holders.

**6.** It is highly unlikely that the Hoits signed the deed, as a deed is typically signed by only the grantor/seller. As observed in footnote 5, the Hoits may have been asked to sign the deed of trust and the promissory note.

734.26[7] of the purchase price for the House. The trial court also found that the Hoits made "expenditures" for 2008 taxes in the amount of $2,208.58 and that the Rankins made "expenditures" for 2007 taxes and insurance in the total amount of $2,757.48. Based on these "contributions," the trial court found the Hoits to have a 98.61% interest in the House and the Rankins to have a 1.39% interest in the House.

The trial court awarded the House outright to the Hoits. The trial court granted the Rankins an owelty[8] judgment against the Hoits in the amount of $2,757.48 and imposed that judgment as a lien against the House. The Rankins appeal.

## Standard of Review

■ A partition action is a court tried action and is thus reviewed pursuant to *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *Keen v. Campbell,* 249 S.W.3d 927, 931 (Mo.App. S.D.2008). "Thus, we will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Clark v. Dady,* 131 S.W.3d 382, 386 (Mo.App. W.D.2004). We defer to the trial court's findings of fact because of its superior ability to assess the credibility of witnesses. *Mo. Land Dev. Specialties, LLC v. Concord Excavating Co., L.L.C.,* 269 S.W.3d 489, 496 (Mo.App. E.D.2008). We review questions of law *de novo. Id.*

## Analysis

The Rankins raise two points on appeal. In their first point, the Rankins claim the trial court should have found that the House was owned equally by the Rankins and the Hoits. In their second point, the Rankins claim that the trial court was strictly limited in its options in a partition action to either division of the House in kind or a forced sale of the House with a division of the proceeds and thus erred in awarding a judgment to reimburse the Rankins for taxes and insurance they paid.[9] We disagree.

## Point I

In their first point on appeal, the Rankins contend that because the deed conveying title was silent as to the parties' respective ownership interests, there was a presumption that the Rankins and the Hoits each held a 50% interest in the House. The Rankins claim this presumption could not be rebutted because of the family relationship between the parties and/or because the Hoits' had a donative intent. In support of their position, the Rankins rely on *Montgomery v. Roberts,* 714 S.W.2d 234, 236 (Mo.App. E.D.1986).

In *Montgomery,* the court held that if a deed:

'[d]oes not specify the shares of each co-tenant, it will be presumed that they take equal undivided interests, but this presumption may be rebutted by proof,

---

7. This sum includes the $188,500 purchase price for the House and all of the charges assessed to the buyers at closing.

8. Owelty is "[a] sum of money paid by one of two . . . co-tenants to the other, when a partition has been effected between them, but, the land not being susceptible of division into exactly equal shares, such payment is required to make the portions respectively assigned to them of equal value. The power to grant owelty has been exercised by the courts

of equity from time immemorial." BLACK'S LAW DICTIONARY 996 (5th ed.1979).

9. A casual reader will find it odd that the Rankins are contesting the trial court's authority to award a judgment in their favor. We perceive the Rankins' argument as presuming that we will find they were entitled to an award of an interest in the House, and thus as presuming we will require a division or forced sale of the House.

e.g., that the co-tenants contributed unequal amounts toward the purchase of the property *and there is neither family relationship among the co-tenants nor any evidence of donative intent on the part of those who contributed more than their pro rata amounts* towards the purchase price.' [10]

*Montgomery*, 714 S.W.2d at 236 (quoting Roger Cunningham, William Stoebuck, Dale Whitman, THE LAW OF PROPERTY, Section 52[sic] [11] (1984) (emphasis added)). Before *Montgomery*, the highlighted language in the above cited passage, which suggests the presumption of equal ownership *cannot* be rebutted if there is evidence of a family relationship and donative intent, had never before appeared in a Missouri case.

Prior to *Montgomery*, our Supreme Court stated in *Anderson v. Stacker*, 317 S.W.2d 417, 421 (Mo. banc 1958), that:

'[a] conveyance to grantees as husband and wife, although the parties were knowingly living in meretricious relations, will, *nothing being shown to warrant a different conclusion,* ordinarily be construed to create a tenancy in common, and *the property so conveyed will be apportioned,* in partition or similar proceedings, *on that basis, the apportionment not always being in equal shares but according to the proportionate contribution* of each of the grantees toward the acquisition of the property.'

(Emphasis added) (citation omitted). Following *Anderson*, in *Atkinson v. Dasher*, 588 S.W.2d 215, 216–17 (Mo.App. W.D. 1979), we held that " '[w]here a conveyance to two or more persons is silent as to the interest of each, their interests are presumed to be equal, but the presumption is rebuttable by evidence to the contrary, such as evidence showing the contributions of joint purchasers to have been unequal.' " (quoting 86 C.J.S. *Tenancy in Common,* Section 18, at 378–79,[12] and citing *Anderson*, 317 S.W.2d at 421). In *Clark,* we concluded that *Anderson* and *Atkinson* are consistent, as both hold that interests of co-tenants will be presumed equal if the deed is otherwise silent, though that presumption can be rebutted. 131 S.W.3d at 387–88.

Neither *Anderson* nor *Atkinson* described or alluded to the presence of "conclusive limitations" on the rebuttable nature of the presumption of equal ownership. *Montgomery* was the first Missouri case to suggest that the presumption of unequal ownership among co-tenants can be rebutted but only if *neither* a family relationship *nor* donative intent are present. 714 S.W.2d at 236.

Several cases have since favorably cited the language in *Montgomery* addressing the effect of evidence of a family relationship and donative intent on the ability to rebut the presumption of equal ownership. These cases, as our discussion will reveal, have interpreted the principle first cited in *Montgomery* as an irrebuttable presumption such that *any* evidence of a family relationship and/or donative intent will negate the trial court's ability to weigh other relevant evidence on the subject of owner-

---

**10.** This principle applies equally to property held in joint tenancy as well as in tenancy in common. ROGER A. CUNNINGHAM, ET AL., THE LAW OF PROPERTY, Section 5.13 (1984).

**11.** There is no section 52 in the referenced treatise. The quoted passage is actually found in section 5.2.

**12.** The current bound volume of the treatise cited in *Atkinson* which contains the referenced passage is 86 C.J.S. *Tenancy in Common,* Section 13, at 257 (2006).

ship. We question affording *Montgomery* the effect of having created an irrebuttable presumption. It is unlikely the court would have espoused a previously unrecognized basis for rendering the presumption of equal ownership irrebuttable without any discussion or analysis. Moreover, our Supreme Court has never recognized that the presumption of equal ownership can be rendered irrebuttable by any factual circumstance. We believe it appropriate, therefore, to re-examine the genesis of the language first cited in *Montgomery* relating to the effect of evidence of a family relationship and donative intent, and to examine whether that "language" has been improvidently relied on to elevate evidence of a family relationship and donative intent into an irrebuttable presumption of equal ownership.

### Historical development of the principal announced in Montgomery

When the Eastern District held in *Montgomery* that the presumption of equal ownership "may be rebutted by proof, e.g., that the co-tenants contributed unequal amounts toward the purchase of the property *and there is neither family relationship among the co-tenants nor any evidence of donative intent on the part of those who contributed more than their pro rata amounts* towards the purchase price," 719 S.W.2d at 236 (emphasis added), it quoted from, and relied exclusively on, a treatise-THE LAW OF PROPERTY, section 5.2 (1984). The passage as it appears in THE LAW OF PROPERTY, section 5.2 (1984) is supported by a footnote which reflects the authors' reliance on three cases, with the principal source be-

ing *People v. Varel,* 351 Ill. 96, 184 N.E. 209 (1932).

In *Varel,* the Illinois Supreme Court held that "[w]here title to property is taken in the name of two persons as cotenants, and their contributions to the purchase price of the property are unequal *and their relationship is not such that a gift from one to the other is presumed to be intended,* they will in equity be held to own the property in the proportions of their contributions to the purchase price." *Id.* at 211 (emphasis added). On reading *Varel,* several things are evident. First, the word "family" does *not* modify *Varel*'s discussion of relationship, rendering suspect THE LAW OF PROPERTY'S (1984) unilateral insertion of the modifier. Second, and of even greater relevance to our discussion, *Varel* did not hold that a relationship among co-tenants where a donative intent might be reasonably presumed prevents a court from assessing the proper weight to be afforded such evidence. In other words, *Varel* did not treat evidence of a relationship where donative intent might be presumed as conclusive. Indeed, the court held that "[t]he ownership of the property and the relationship of Mrs. Varel *and her mother* is not such that a gift from one to the other may be presumed to have been intended *in this case.*" *Varel,* 184 N.E. at 211 (emphasis added). Thus, although the parties in *Varel* were mother and daughter—certainly a relationship where donative intent might reasonably be presumed—the court viewed the evidence as insufficient to support a finding of donative intent given the facts and circumstances in the case.[13]

---

**13.** A similar principle is espoused in the two other cases cited in the footnote offered by the authors of THE LAW OF PROPERTY (1984) as the support for the statement addressing "neither family relationship nor donative intent." *See Williams v. Monzingo,* 235 Iowa

434, 16 N.W.2d 619, 622–23 (Iowa 1944) (Deed reflected that husband and wife owned property as tenants in common and they were thus presumed to take equal shares. "However, this presumption is a rebuttable one and does not prevent proof from being introduced

Essentially, *Varel* articulated nothing more than a simple principle of evidence. A relationship such that a gift from one to the other might be presumed will be relevant to a court as it considers whether evidence of unequal contributions should be permitted to rebut the presumption of equal ownership. This is eminently reasonable. If unequal contributions to acquire property can be explained by evidence of a relationship suggesting a gift was intended, then of course a court should consider that evidence. This is a far cry, however, from treating evidence of a relationship from which donative intent can be presumed as a *per se* basis for rendering the presumption of equal ownership irrebuttable. Unfortunately, the language used by the authors of THE LAW OF PROPERTY (1984) to paraphrase *Varel* unwittingly did just that by elevating a common sense principle of evidence into a principle which reads like an irrebuttable presumption. That "error" has been perpetuated, beginning with *Montgomery*.

### The application of the Montgomery principle in subsequent Missouri cases

In *Montgomery*, the Eastern District found that an unmarried couple named as tenants by the entirety on a deed were in fact tenants in common. 714 S.W.2d at 236. One of the tenants in common had contributed the entire purchase price to acquire the property. *Id.* at 235. The court found that as "there was no evidence of donative intent . . . nor the existence of a family relationship, the property had to be apportioned according to the contribution of each towards the acquisition of the

property." *Id.* at 236. Whether intended or not, the court seemed to be suggesting that had there been evidence of a family relationship and donative intent, the trial court would have been conclusively bound to treat the co-tenants as equal owners of the property.

Two Western District cases have since cited *Montgomery*. In *Lemay v. Hardin*, 48 S.W.3d 59, 63 (Mo.App. W.D.2001), we favorably cited *Montgomery* but were not required to analyze or apply the principle relating to "neither a family relationship nor donative intent." In *Clark*, we favorably cited *Montgomery*. 131 S.W.3d at 387. After noting that "the record discloses that the parties were not related *and* there is nothing to suggest that there was any donative intent," we looked to the evidence of disproportionate contributions toward acquisition of a mobile home and concluded that the presumption of equal ownership had been rebutted. *Id.* at 389 (emphasis added). Though not expressly stated, *Clark* suggested, as had *Montgomery*, that had evidence of *both* a family relationship and donative intent been present, the court would have been bound by the conclusive presumption that all co-tenants held equal shares in the ownership of the property. *Id.*

The Eastern District and the Southern District have also favorably cited *Montgomery* but have read the "neither/nor" reference to family relationship and donative intent to mean that "either" circumstance will render the presumption of equal ownership conclusive. In *Snyder v. Snyder (In re Estate of Snyder)*, 880

---

that the respective holdings and the interests of the parties are unequal. In a showing of unequal contribution, *in the absence of further proof* the prior presumption is overcome and another presumption arises; that is that the parties intended to share in proportion to the amount contributed by each to the purchase price.") (emphasis added); *Taylor v.*

*Taylor*, 310 Mich. 541, 17 N.W.2d 745, 746 (1945) ("'Where there is a doubt as to the meaning of an instrument, the *courts will consider the situation of the parties, the subject-matter, and the acts, conduct, and dealings of the parties* with respect to the instrument.'") (emphasis added).

S.W.2d 596, 599 (Mo.App. E.D.1994), the Eastern District concluded that the presumption of equal ownership "may be rebutted by proof that the parties contributed unequal amounts to acquisition of the property *or* where there is no family relationship between the parties." (Emphasis added.) In *Christen v. Christen,* 38 S.W.3d 488, 492 (Mo.App. S.D.2001), the Southern District held that "unequal contribution is irrelevant in determining the joint tenants' respective shares when there is a family relationship between the tenants *or* when there is evidence of donative intent." (Emphasis added.) In *Johannsen v. McClain,* 235 S.W.3d 86, 87–88 (Mo. App. S.D.2007), the Southern District held that the presumption of equal ownership may be rebutted with evidence of disproportionate contributions to the purchase of the property "as long as there is also *neither* a family relationship between the co-tenants *or* evidence of donative intent by the party who contributed more than his pro rata amount towards the purchase price." (Emphasis added.)

The full impact of the evolution from the "neither-nor" principle described in *Montgomery* to the "either-or" principle described in *Christen, Estate of Snyder,* and *Johannsen* was realized in *Nelson v. Killman (In re Killman),* Bankr.No. 08–61703, Adversary No. 09–6075, 2010 WL 743685 (Bankr.W.D.Mo. Feb.26, 2010). In *Killman,* the court, after quoting *Montgomery* verbatim, then stated "[i]n other words, '[an] unequal contribution *is irrelevant* in determining the joint tenants' respective shares when there is a family relationship between the tenants *or* when there is evidence of donative intent.'" *Id.* at *3 (quoting *Christen,* 38 S.W.3d at 492). The court then found that because the involved parties "have a family relationship, *I need not reach the question of donative intent." Id.* (emphasis added).

The Rankins rely heavily on *Christen, Estate of Snyder, Johannsen,* and *Killman.* The Rankins maintain that "the original presumption of equal ownership cannot be rebutted by evidence of unequal contributions towards the purchase of the real estate, **if** there is [**either**] evidence of a family relationship **or** evidence of donative intent." (Appellants' Br. 19) The Rankins thus argue that their family relationship with the Hoits rendered the presumption of equal ownership irrebuttable and that the trial court was powerless to consider the uncontested evidence that the Hoits contributed 100% of the purchase price for the House in determining the relative interests of the parties in the House. We do not agree.

First, we believe it obvious that *Montgomery's* reference to "neither" a family relationship "nor" donative intent cannot be read to permit "either" a family relationship "or" donative intent to render the presumption of equal ownership irrebuttable. The ordinary and common definition of "neither" is:

> [N]ot either of two . . . . not one of two or more: not either . . . . not the one and not the other of two. . . .
>
> [U]sed as a function word before two or more coordinate words, phrases, or clauses now joined usu. by *nor* or sometimes by *or* or archaically by *neither* to indicate that what immediately follows is the first of two or more alternatives both or all of which are rejected.

MERRIAM–WEBSTER DICTIONARY 1514 (3rd ed.1993). "Neither/nor," therefore, means "both" and is the antithesis of "either/or." Thus, when *Montgomery* stated that the presumption of equal ownership can be rebutted in the absence of *neither* a family relationship *nor* donative intent, it was necessarily stating that *both* conditions must be present, not merely one or the other. To the extent *Christen, Es-*

*tate of Snyder, Johannsen,* and *Killman* suggest that *either* a family relationship *or* donative intent will suffice to render the presumption of equal ownership irrebuttable, they should not be followed.[14]

Second, and of even greater import, we do not believe that any rationale or reasoned basis exists to conclude that the rebuttable presumption of equal ownership becomes irrebuttable even if evidence of *both* a family relationship and donative intent are present. Instead, having explored the origin of the principle first cited in *Montgomery*, it is clear to this court that "family relationships" and "donative intent" amount to nothing more than evidence which may be considered and weighed by the court to possibly explain unequal contributions toward the acquisition of property. Unfortunately, the paraphrasing of *Varel* by THE LAW OF PROPERTY (1984), which was then repeated by *Montgomery*, has misdirected subsequent courts to the unwarranted conclusion that an inflexible litmus test exists such that *either* a family relationship *or*

donative intent (in the Eastern and Southern Districts) or *both* a family relationship *and* donative intent (in the Western District) will completely negate a trial court's ability to consider and weigh all relevant evidence to determine the interests of cotenants in property. We have located no authority (other than that which has arisen out of the improvident paraphrasing of *Varel* in THE LAW OF PROPERTY (1984)) which supports such a proposition.

■ We conclude, therefore, that evidence of a relationship among cotenants suggestive of donative intent amounts to nothing more than relevant evidence which may be considered by a trial court as it determines whether the presumption of equal ownership has been rebutted. This view is in complete accord with other learned treatises on the subject. For example, 20 AM.JUR.2D *Cotenancy and Joint Ownership*, Section 117, at 247–48 (2005), states:

> Where two or more persons take as tenants in common under an instrument silent as to their respective shares, there

**14.** Notwithstanding our view that *Christen, Estate of Snyder,* and *Johannsen* should not be followed for the proposition that *"either"* a family relationship *"or"* donative intent will render the presumption of equal ownership irrebuttable, we note there is no need to overrule these decisions as they reached a result that is consistent with the law hereinafter described in this Opinion. In *Christen*, there was evidence of both a family relationship (the co-tenants were half-brothers) and donative intent (one half-brother included the other half-brother's name on the deed out of gratitude for an agreement to challenge the probate of his mother's estate from which the first half-brother was excluded). Though we hereinafter hold such evidence cannot be viewed as creating an irrebuttable presumption, the evidence in this case would nonetheless supported a finding that unequal contributions toward the purchase of property were otherwise explained. *Christen*, 38 S.W.3d at 492. In *Estate of Snyder*, the court found no evidence of a family relationship or of dona-

tive intent and, thus, did not apply *Montgomery's* principle as an irrebuttable presumption. 880 S.W.2d at 599–600. Similarly, in *Johannsen*, the court found no evidence of a family relationship or of donative intent, and thus *Montgomery's* principle was not applied as an irrebuttable presumption. 235 S.W.3d at 88.

On the other hand, *Killman* reached a result which cannot be reconciled with our view of the law as hereinafter described in this Opinion. *Killman* never discussed donative intent once it found there was a family relationship between the co-tenants. 2010 WL 743685, at *3. The federal bankruptcy court thus ignored evidence of unequal contributions toward purchase of the property and deemed the presumption of equal ownership irrebuttable based solely on the presence of a family relationship among the co-tenants. *Id.* Though we are unable to overrule *Killman*, we can instruct that its analysis is not accurate and should not be followed.

is a presumption that their shares are equal. *Ordinarily, this presumption is not conclusive but is subject to rebuttal,* and has at times been rebutted by parole evidence. A party challenging the presumption that property held in joint tenancy is equally owned has the burden of proof.

The presumption is *applicable only in the absence of evidence to the contrary.* Where the cotenancy property is acquired by purchase and *there is evidence as to the proportion of the total purchase price paid by each tenant in common, such evidence* **may** *be determinative* of the proportion owned by each cotenant. . . .

*The fact that the tenants in common are husband and wife* **may** *lead to the conclusion that they own equal shares, regardless of any disparity in their respective contributions toward its acquisition, on the theory that the spouse furnishing the consideration, or most of the consideration, for the property intended a gift to the other. This conclusion* **may** *apply to other familial relationships, or to cotenants who are cohabitating and intend to confer equal shares by gift despite unequal contribution.*

(Emphasis added.) Clearly, this treatise does not treat *any* relationship between co-tenants as dispositive on the issue of equal ownership. Instead, this treatise recognizes that the nature of the relationship between co-tenants *may be relevant* to assist the trial court in determining whether unequal contributions toward acquiring property can be explained as a gift.

Ironically, other passages drawn from THE LAW OF PROPERTY (1984) also support our conclusion. The discussion of partition within the treatise states:

When a concurrent estate is created by a deed or will that does not expressly provide to the contrary, it will be presumed that each concurrent owner obtains an equal undivided interest. If the deed or will creating the concurrent estate expressly provides for unequal interests, it will necessarily create a tenancy in common and the co-tenants will obtain the unequal interests specified in the instrument. *But even where unequal interests are not expressly provided for in the creating instrument, the presumption of equality may be rebutted for purposes of determining the share of each co-tenant in a partition action, whether the concurrent estate is a joint tenancy or a tenancy in common.*

THE LAW OF PROPERTY, Section 5.13 (1984) (emphasis added). In the footnote referenced as support for the highlighted principle cited above, the treatise provides:

The rule is * * * that the interests of joint tenants being equal during their lives, a presumption arises that upon dissolution of the joint tenancy during the lives of the cotenants, each is entitled to an equal share of the proceeds. This presumption is subject to rebuttal, however, and does not prevent proof from being introduced that the respective holdings and interests are unequal. *This presumption may be rebutted by evidence showing the source of the actual cash outlay at the time of acquisition, the intent of the cotenant creating the joint tenancy to make a gift of the half-interest to the other cotenant, unequal contribution by way of money or services, unequal expenditures in improving the property or freeing it from encumbrances and clouds [on title], or other evidence raising inferences contrary to the idea of equal interest in the joint estate.* [Citation omitted]

THE LAW OF PROPERTY, Section 5.13 (1984) (emphasis added). Thus, the same treatise whose unfortunate paraphrasing of *Varel* has inadvertently lead to the existence of an irrebuttable presumption in Missouri recognizes that unequal contributions toward purchase, donative intent, and other such matters constitute no more than evidence to be collectively weighed by the trial court, along with the reasonable inferences to be drawn from the evidence, in determining whether the presumption of equal ownership afforded an otherwise silent deed has been rebutted.

We conclude that the principle first cited in *Montgomery* relating to "neither family relationship nor donative intent" should no longer be cited verbatim [15] as the manner in which the principle was initially written improvidently suggests the existence of an irrebuttable presumption. Instead, we take advantage of this opportunity to clarify the principle cited in *Montgomery*. The presumption that co-tenants hold equal ownership shares in property in the face of a deed that is otherwise silent may be rebutted. Evidence relevant to rebut the presumption may include evidence that the co-tenants contributed unequally toward the purchase of the property. However, unequal contributions may be explained by evidence that the co-tenant contributing a greater amount toward purchase intended the disparity as an enforceable gift, a determination which may be influenced by evidence of the nature of the relationship among the co-tenants.[16]

### Application of modified principle to this case

As applied to this case, Rankin is the son of Mrs. Hoit and the step-son of Mr. Hoit. However, Webb was Rankin's seventh wife and was barely known to the Hoits. The trial court heard uncontested evidence that the Hoits' intended the Rankins to take ownership of the House, but only on the Hoits' deaths.[17] The Hoits testified that they never intended to give the House to the Rankins at the time of purchase.

The Rankins argue that the use of a joint tenancy deed, instead of a beneficiary deed,[18] requires us to conclude that the Hoits knew what they were doing and intended a present gift of at least a 50% interest in the House to the Rankins. However, there was evidence which per-

---

15. This conclusion does not require us to overrule *Montgomery* or *Clark,* as the outcome of those cases is not altered by the clarification of the law described in this Opinion. In both cases, the courts found neither a family relationship nor any evidence of donative intent, and thus neither court applied the principle drawn from *Montgomery* as an irrebuttable presumption. *Montgomery,* 714 S.W.2d at 236; *Clark,* 131 S.W.3d at 389. We also need not overrule *Lemay,* as its holding was not dependent upon Montgomery's discussion of "family relationships and donative intent." 48 S.W.3d at 63.

16. The presumption of equal ownership among co-tenants on an otherwise silent deed will be more easily rebutted in an action to determine ownership when all co-tenants are alive and available to testify about their intentions. Once a co-tenant passes, however, it may be more difficult to present credible or unbiased evidence that a deceased co-tenant did not intend an unequal contribution towards purchase of property as a gift. However, any difference in outcomes in cases involving living or deceased co-tenants will merely be the result of evidence being weighed based upon the unique facts and circumstances of the case.

17. In fact, the Rankins' counterclaim asserts that their claim for damages arises out of their claimed reliance on the promise of a gift of the House after the deaths of the Hoits.

18. A beneficiary deed is expressly permitted by section 461.025 and conveys property to a stated recipient on the death of the grantor, without restricting the grantor's ownership of the property during his or her lifetime.

mitted the trial court to conclude to the contrary. As previously stated, the Hoits were surprised to see the Rankins' names on the deed when they appeared at closing. Mr. Hoit testified he did not understand the legal significance of the Rankins' names being on the deed. The Rankins secured the mortgage used to close on the House. The Rankins concede that the deed was likely prepared by their lender and that all names were on the deed at the lender's insistence to perfect its collateral position in the House.

Moreover, the Hoits would certainly have been free to revoke or modify their future donative intent had it been reflected in a beneficiary deed [19] or in a will.[20] We see no logical basis for differentiating between these estate planning tools and a joint tenancy deed if the evidence supports a conclusion that a present gift of ownership was not intended. *See Stout v. Stout,* 564 S.W.2d 89, 90 (Mo.App.1978) ("The

phrase 'with right of survivorship' is meaningful only to control the disposition of the fee upon death of one of the joint tenants. Such a phrase does not, as a matter of law, indicate by implication or otherwise an agreement not to partition.").

▉▉▉ We find no error, therefore, in the trial court's award of the House in its entirety to the Hoits. The presumption of equal ownership of the House afforded by the deed, which was otherwise silent on the subject of ownership shares, was rebutted by the uncontested evidence that the Hoits contributed 100% of the cost to acquire the House,[21] and by the absence of evidence that the Hoits' unequal contribution toward purchase of the House could be explained by their intent to make a present and irrevocable gift to the Rankins.[22]

Point One is denied.

---

19. Section 461.025.

20. Section 474.400; *Humphreys v. Welling,* 341 Mo. 1198, 111 S.W.2d 123 (1937).

21. The trial court found that based on "contributions" to the House including purchase price, taxes, and insurance, the relative "interests" of the parties in the House were 98.61% and 1.39%. However, in a partition action, a trial court is to determine the respective interests of parties in property which has been acquired by purchase by looking only at contributions toward the purchase price. *See* section 528.030; *Clark,* 131 S.W.3d at 389 ("In partition, the presumption of equal shares of tenants in common may be rebutted by proof of a disproportionate contribution of each party *toward the acquisition of the property.*") (emphasis added) (citations omitted). As will be discussed in our analysis of point two, contributions for taxes, insurance, repairs, and maintenance are treated separately. Here, it would have been more appropriate for the trial court to have expressly found that the Hoits had a 100% interest in the House based on their 100% contribution toward the purchase price. However, we are easily able to discern that the trial court did indeed conclude that the Hoits con-

tributed 100% of the purchase price, a finding which is not contested by the Rankins.

22. The Hoits bore the burden to overcome the presumption of equal ownership. 20 AM. JUR.2d, *Cotenancy and Joint Ownership,* Section 117, at 247 (2005). This burden undoubtedly included the obligation to offer evidence of the unequal contributions toward acquisition of the property, and the obligation to negate that the inequality in contributions was a result of a present donative intent. There is some authority for the proposition that satisfying this burden requires clear and convincing evidence. *See, e.g.,* 86 C.J.S. *Tenancy in Common,* Section 13, at 257–58 (2006) ("Parties who own property jointly are presumed to be tenants in common, but the presumption is rebuttable by clear and convincing evidence."). However, cases have relied on Missouri Supreme Court decisions which "set forth the general rule that when a presumption is operating against a party, that party need only introduce substantial controverting evidence to rebut that presumption." *Johannsen,* 235 S.W.3d at 88 (relying on *Wills v. Townes Cadillac–Oldsmobile, Inc.,* 490 S.W.2d 257, 260 (Mo. banc 1973) and *Michler v. Krey Packing Co.,* 363 Mo. 707, 253 S.W.2d

## Point Two

For their second point on appeal, the Rankins complain that the trial court erred in awarding the House outright to the Hoits and in entering a judgment in the Rankins' favor and against the Hoits, imposing same as a lien on the House. The Rankins claim the trial court's only options in this partition action were to partition the House in kind or to order the House sold with the proceeds to be divided. We disagree.

Section 528.030 provides:

In all cases where lands ... are held in joint tenancy, tenancy in common, or coparcenary ... it shall be lawful for any one or more of the parties interested therein ... to file a petition in the circuit court of the proper county, asking for ... partition ... if the same can be done without great prejudice to the parties in interest; and if not, then for a sale of the premises, and a division of the proceeds thereof among all of the parties, according to their respective rights and interests.

In addition, as we noted in *Clark*, "[i]t is well settled that in a partition proceeding, the parties are entitled to reimbursement for expenditures with respect to the property for taxes, insurance and necessary repairs and improvements." 131 S.W.3d at 390 (citing *Hahn v. Hahn*, 297 S.W.2d 559, 567 (Mo. banc 1957); *Cmty. Bank of Chillicothe v. Campbell*, 870 S.W.2d 838, 841 (Mo.App. W.D.1993); *Bass v. Rounds*,

811 S.W.2d 775, 782 (Mo.App. E.D.1991); *Hartog v. Siegler*, 615 S.W.2d 632, 636 (Mo.App. E.D.1981)). "[R]eimbursement is available where [expenditures] are 'made in good faith, are of a necessary and substantial nature, materially enhance the value of the property, and the circumstances show that it would be equitable to do so.'" *Clark*, 131 S.W.3d at 390 (quoting *Hartog*, 615 S.W.2d at 636).[23]

Thus, in a partition action, a trial court must declare the interests of the purported co-tenants in the property and must then either divide the property in kind or sell the property with the proceeds divided accordingly. A trial court may also reimburse a co-tenant for contributions made to improve or repair the property, even though this "relief" is not expressly described in section 528.030. If property is partitioned in kind, such reimbursements are made by placing an equitable lien on the property partitioned to the other party. *Clark*, 131 S.W.3d at 390. Reimbursements are effectuated in the event of a partition sale by "offsetting the reimbursable expenditures against the sale proceeds partitioned to the other party." *Id.* A trial court is not authorized, however, to enter an *in personam* money judgment for the reimbursements. *Lemay*, 48 S.W.3d at 62 (holding that the award of property in kind in its entirety to one cotenant while requiring that cotenant to pay the other party for repairs and improvements to the property is not authorized by partition statute); see *Clark*, 131 S.W.3d

---

136, 140 (1952)). We believe, therefore, that the required burden of proof to overcome the presumption of equal ownership is substantial evidence. The Hoits met this burden and, in any event, would have satisfied their burden *even assuming application of the more stringent clear and convincing evidence standard.*

**23.** This line of cases lends further support to the proposition that the determination of the ownership interests held by co-tenants focuses

on the contributions of the parties to the acquisition of the property. Other "contributions" which may have benefitted the property after it was purchased, but which were not incurred in the initial acquisition of the property, are not factored into the determination of relative ownership interests, though said contributions may be otherwise eligible for reimbursement. *See* footnote 21.

at 391 (holding, after discussing *Lemay*, that although a money judgment may not be appropriate, it is appropriate to award 100% of the property in kind to one party, while imposing an equitable lien on the property for any repairs and improvements made to the property by the other party).

■ Here, the trial court partitioned the House in kind. It awarded the House 100% to the Hoits given their 100% contribution toward its acquisition. This represented the trial court's proper exercise of one of the two options expressly envisioned by section 528.030. The trial court also awarded the Rankins a "judgment of $2,757.48, against both Plaintiffs [the Hoits]. Said judgment is a lien against the property." The trial court was authorized to enter this judgment to the extent the judgment did no more than impose a lien against the House.

Given the manner in which the judgment in favor of the Rankins was written, it is not entirely clear whether the trial court intended to impose both an *in personam* judgment against the Hoits *and* an equitable lien against the House, or whether the trial court intended to only impose a lien on the House. The trial court did make a separate finding, however, which sheds light on its intention. The trial court found that "the judgment for owelty should be the full amount of the moneys contributed by Defendants [the Rankins]." As previously noted, owelty is a lien imposed on property partitioned in kind. BLACKS LAW DICTIONARY 996 (5th ed.1979). The trial court's finding that an

owelty judgment should be imposed suggests that the trial court only intended to award the Rankins an *in rem* judgment imposing a lien on the House.[24]

We thus conclude that the trial court did not err in reimbursing the Rankins by imposing an equitable lien on the House. *See Clark*, 131 S.W.3d at 391 ("Inasmuch as the appellant made no contribution to the acquisition of the property, the trial court, under the law of partition ... was authorized to award 100% of the property in kind to the respondent and to place an equitable lien thereon in favor of the appellant ... for repairs and improvements."). Point Two is denied.

■ We do acknowledge that the Judgment could be misread to impose an *in personam* judgment on the Hoits. As we have concluded this was not the trial court's intent, and as to avoid any confusion, we will exercise our authority pursuant to Rule 84.14 to "give such judgment as the [trial] court ought to give," as the record here permits us to do so. The Judgment is modified to delete the judgment granted the Rankins in the amount of $2,757.48 and to substitute the following: "IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that Defendants are granted an *in rem* judgment in the amount of $2,757.48, which judgment shall be imposed as an equitable lien against the House, legally described as Lot 163, Brooke Haven Fourth Plat, A Subdivision in Kearney, Clay County Missouri."[25]

24. Owelty is actually a means of equalizing the relative value of property that has been divided in kind among co-tenants and is not the label applied to an equitable lien imposed to "reimburse" for expenditures which improve a property. *See* footnote 8. However, the fact that the trial court used the wrong

legal term to identify the lien it desired to impose on the House is immaterial.

25. Judgments imposing liens against real property should provide the legal description of the property to permit proper recordation of the lien interest.

## Conclusion

The trial court's judgment as herein modified is affirmed.

All concur.